**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and HOWARD McDOUGALL, Trustee, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 10-1447 |
| | ) | |
| vs. | ) | Judge Kennelly |
| | ) | |
| MURPHY BROTHERS, INC., an Illinois corporation, | ) ) | Magistrate Judge Cox |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

Timothy C. Reuter  (ARDC #06279373)
CENTRAL STATES FUNDS
Law Department
9377 W. Higgins Road, 10th Floor
Rosemont, IL  60018
(847) 518-9800, Ext. 3481
treuter@centralstatesfunds.org

*COUNSEL FOR CENTRAL STATES*

F:354532 / 09415353 / 12/13/10

## I.  INTRODUCTION

In its Response to the Central States, Southeast and Southwest Areas Pension Fund's (the "Fund") Summary Judgment Pleadings ("Df. Resp."), Murphy Bros., Inc. ("Murphy") has failed to prove that it is entitled to the extremely limited exception to the strict interim payment requirement imposed by the MPPAA.  It has failed to establish that the Fund's withdrawal liability assessment is frivolous. In fact, Murphy attempts to argue that it is entitled to the building and construction industry exemption by discussing everything *except* the one thing it will need to prove in the pending arbitration, namely, that substantially all the employees with respect to whom the employer has an obligation to contribute under the plan performed work in the building and construction industry. Instead, Murphy claims that it is entitled to the exemption merely because the Fund has adopted the statutory exemption.  This, however, ignores the fact that an employer must still satisfy the exemption's underlying statutory requirements, a concept which is made clear by the very collective bargaining agreement ("CBA") upon which Murphy relies. Murphy also tries to argue that it is entitled to the exemption because,  insofar as the company is a building and construction industry employer, it must follow that all of its employees perform work in the building and construction industry.  In bringing forth this argument, Murphy is disregarding the plain language of the statute as well as the National Labor Relations Board ("NLRB") decisions and federal court decisions interpreting that language.

Moreover, Murphy has failed to prove how it will be irreparably harmed by being forced to make the statutorily required interim withdrawal liability payments.  In fact, Murphy

never actually explains how it would be harmed at all. It merely state that the company has no assets but fails to provide a single piece of evidence as to how a judgment against it would cause irreparable harm.

For these reasons, this Court should grant the Plaintiff's Motion for Summary Judgment ("PMSJ") and deny the Defendant's Motion for Summary Judgment ("DMSJ").

## II. ARGUMENT

Murphy spends a great deal of time discussing the Fund's statement that it "was forced to file this lawsuit to collect the past due payment." (Def. Resp. at 2.) Murphy goes on to describe, in detail, the time-line of the present action. Murphy makes broad assertions as to what the Fund meant by the statement without acknowledging the obvious, that the Fund was forced to file the lawsuit because Murphy never made the payment. Murphy has not made *any* payments to the Fund towards its withdrawal liability. As such, the Fund was forced to file a lawsuit.

Murphy even accepts that there is only one extremely limited exception to the strict interim payment requirement. An employer can avoid making interim payments only if it establishes *both* (1) that the Fund's claim is frivolous *and* (2) that it would be irreparably harmed by making the interim payments. *Cent. States, Se. & Sw. Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1019 (7th Cir. 2001). Moreover, Murphy cannot simply claim it would be irreparably harmed, it must first prove that the Fund has no colorable claim whatsoever. *Trustees of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Rentar Indus., Inc.*, 951 F.2d 152, 155 (7th Cir. 1991)

("irreparable harm becomes important only if the employer makes an affirmative showing that the pension fund lacks a colorable claim")

### A.    Central States Has A Colorable Claim Against The Defendant.

Murphy has failed to prove that the Fund has no basis upon which to claim that the company is not entitled to the building and construction industry exemption.  A claim is frivolous if it has "no arguable basis in law or fact." *Talley v. Lane*, 13 F.3d 1031, 1033 (7th Cir. 1994); *Cent. States, Se. & Sw. Areas Pension Fund v. Warner & Sons, Inc.*, 2008 WL 4201014, *2 (N.D. Ill 2008) (attached hereto as **Exhibit A**.)  The Fund's claim has a well founded basis in both the law and the facts.  In its Response, Murphy mentioned  the various job classifications utilized by the company but never described how its Teamster employees performing these jobs were actually performing work in the building and construction industry, except to say that, "Of course [Murphy] had employees performing construction work. [Murphy] simply could not have constructed pipe lines without employees who performed the work necessary to construct those pipe lines." (Def. Resp. at 9.)  As the Fund has stated time and again, Murphy may very well have had employees performing work in the building and construction industry, but the focus of the exemption, as it relates to Central States, is the work performed by the employees on whose behalf Murphy was obligated to contribute to the Fund.  As the Fund has shown, these were not building and construction industry employees.

Murphy argues that, based upon the language contained within Schedule B of its CBA, it was only required to contribute to plans which primarily cover employees in the building and construction industry, or plans which have been amended to recognize the

building and construction industry exemption.  Murphy also quotes what it claims to be the

"relevant" part of Schedule B, stating:

> Furthermore, under this Agreement Employer shall only be obligated to contribute to plans, which primarily cover employees in the building and construction industry, or plans, which have been amended to provide that the construction industry exemption of Sec. 4203 of ERISA applies.

(Def. Resp. at 4.)  However, Murphy conveniently takes this quote out of context by failing

to include the sentence directly preceding the language above which states:

> Said Employer's obligations shall also be considered with and limited by the construction industry exemption of [ERISA], as amended by [MPPAA] <u>as long as said Employer is a construction industry employer within the meaning of 29 U.S.C. §1383(b) of ERISA and/or [MPPAA]</u>.

(Defendant's L.R. 56.1(a)(3) Statement of Material Facts ("Df. SMF"), ¶ 21.)  The Fund

does recognize that the building and construction industry exemption applies to "those

Employers described in ERISA section [1383(b)(1)]." (Pl. SAMF ¶ 15.)  However, the mere

fact that the Fund has adopted the building and construction industry exemption does not

relieve employers of the burden to prove that they satisfy the statutory requirements.  The

language of the CBA quoted above even contemplates that an employer operating under

the CBA must still qualify for the exemption by inclusion of the modifier "as long as the

Employer is a construction industry employer".

Murphy takes issue with the idea that the exemption only applies to employers

described in 29 U.S.C. §1383(b)(1).  It claims, "this is the equivalent of stating that the

[building and construction industry exemption] only applies to certain employers."   (Def.

Resp. at  5, footnote 8.)  However, that is precisely what the Fund, MPPAA, the language

of the CBA, and all of the caselaw surrounding the building and construction industry

exemption recognize as true.

1.  **Substantially All Of Murphy's Employees On Whose Behalf It Was Required To Contribute To The Fund Do Not Perform Building And Construction Industry Work**

Murphy, in its Response, is once again attempting to claim that, simply because it has some employees who perform building and construction industry work, it must follow that it is entitled to the building and construction industry exemption. Murphy states, "Of course [Murphy] had employees performing construction work. [Murphy] simply could not have constructed pipe lines without employees who performed the work necessary to construct those pipelines." (Def. Resp. at 9.) Murphy also states, "the Plaintiffs do not dispute [Murphy] was an employer within the building and construction industry." (Id.) The Fund has neither claimed that Murphy did not have employees who performed building and construction work nor that Murphy did not perform any work in the building and construction industry. However, the Fund has argued that substantially all of the Teamster employees covered by the CBA which obligated Murphy to contribute to the Fund were not performing work in the building and construction industry. Murphy employed individuals who were represented by four different unions. (Docket No. 25 at 72.) Murphy utilized Laborers, Operators, UAs (welders) and Teamsters. (Docket No. 25 at 72.) However, the issue is whether the Teamsters were performing building and construction industry work.

Murphy makes the statement that "Under the Plaintiffs' fanciful view of the pipe line construction process, because Teamsters and [O]perators are not performing construction work, if Teamsters and [O]perators were removed from the process, the pipe line would still be constructed without their functions being performed." (Def. Resp. at 13.) The statement only goes to show how the Defendant has completely misconstrued the legal inquiry into whether an employer qualifies for the building and construction industry exemption. The

Fund is not concerned with the work performed by the Operators. It may very well be considered building and construction industry work. The Fund is also not concerned with the type of work performed by Murphy in general. Neither of those things has anything to do with the type of work performed by the Teamsters on whose behalf Murphy was obligated to contribute to the Fund. Further, Murphy's argument proves too much. Under Murphy's theory, the factory workers who manufacture the pipe would be performing work in the building and construction industry because, without the pipe, the pipeline could not be constructed.

In order to claim that it is entitled to the exemption, an employer must satisfy the requirements of 29 U.S.C. §1383(b) which provides that:

> in the case of an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, a complete withdrawal occurs *only* as described in paragraph (2), if:
>
> (A)   Substantially all the employees with respect to whom the employer has an obligation to contribute under the plan performed work in the building and construction industry, . . . .

29 U.S.C. § 1383(b)(emphasis added). The statute narrowly focuses on the employees on whose behalf the employer is required to contribute to a particular plan. In this case, the Teamsters on whose behalf Murphy contributed to the Fund. Murphy's numerous proclamations that it is a building and construction industry employer because it is involved in the construction of pipe lines does nothing to further its argument that it is entitled to the building and construction industry exemption. The court in *Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction Inc.,* unequivocally states that the proper focus is on the employees, rather than on the employer.

> "It is the *employees* for whom the employer *has an obligation to contribute* who must substantially all perform work in the building and construction

industry. It is immaterial whether the employer is "primarily" engaged in the building and construction industry; it is immaterial whether substantially all of the employer's employees perform work in the building and construction industry. The statute simply says that the building and construction industry provision applies if substantially all of the employees *for whom the employer has an obligation to contribute* perform work in the building and construction industry."

485 F.Supp. 2d 1206, 1215, (D. Ore. 2007).

Further, Murphy questions the Fund's reliance upon decisions of the National Labor Relations Board regarding the type of work which would be considered building and construction industry work for purposes of MPPAA. However, the term "building and construction industry" is not defined in MPPAA, and the legislative history indicates that Congress intended that this term should be given the same meaning for MPPAA as it has for purposes of the Taft-Hartley Act. *Union Asphalts and Roadoils, Inc. v. MO-KAN Teamsters Pension Fund*, 857 F.2d 1230, 1234 (8th Cir. 1988). This is the reason the Fund has sited a "bevy" of NLRB decisions for the Board's analysis of building and construction industry work, and the NLRB decisions construing the term "building and construction industry" make it clear that the inquiry as to what an *employer* does is separate and distinct from the inquiry as to the work performed by the *employees*.

In order to qualify for the building and construction industry exemption, Murphy must establish that "substantially all" of the employees for whom it contributed to the Fund were building and construction industry employees. *Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co.*, 55 F.3d 1318, 1321 n.1 (7th Cir. 1995). Although the term "substantially all" is not defined in the statute, the Seventh Circuit has defined this term to mean 85% or more. *Id*. Thus, to avail itself of this exemption, Murphy must establish that 85% or more of the employees on whose behalf it submitted contributions to the Fund were

building and construction industry employees. Murphy, however, cannot meet this criteria. In fact Murphy makes no effort to analyze the specific work done by its Teamster employees, but instead makes broad, sweeping statements such as, "[Murphy] utilized Teamsters in the listed job classifications for the construction of pipe lines." (Def. Resp. at 12.) Murphy also states that "the Teamsters clearly had a defined, substantial role in the pipe line construction process" without actually analyzing the role at all. (Def. Resp. at 12.)

It is difficult to fathom how Murphy can argue that the Fund has no colorable claim in the underlying arbitration that Murphy is not entitled to the building and construction industry exemption. The burden of proof lies squarely upon Murphy to establish that substantially all of its Teamster employees covered by the CBA were performing construction industry work. However, Murphy has no documentation to evidence the specific work being performed by each employee. (Plaintiffs Statement of Material Facts ("Pl. SMF, ¶ 18.)) In fact, the only evidence which Murphy provides for proving what type of work its covered employees were performing is the self-serving testimony of its president, William Murphy, who admits that he "usually didn't go to job sites very often." (Plaintiffs' Statement of Additional Material Facts ("Pl. SAMF, ¶ 2.)) In addition, he is unable to quantify the number or percentage of Teamsters who were assigned to each task. (Pl. SAMF, ¶ 3.) Most notably, however, is the fact that Mr. Murphy's testimony supports, rather than refutes, the Fund's argument.

Labor law limits the construction industry exemption to "work done at the site of construction." *N.L.R.B. v. International'al Brotherhood of Teamsters Local 294*, 342 F.2d 18

(2nd Cir. 1965); *see also General Truck Driver's Local 957 v. NLRB*, 934 F.2d 732 (6th Cir. 1991); *Landstrom v. Local Union No. 65*, 476 F.2d 1189 (2nd Cir. 1973). Moreover, the exemption does not extend to delivery of materials. *Teamster's Local 982*, 181 NLRB 515, 76 LRRM 1764 (1970), *aff'd*, 450 F.2d 1322 (D.C. Cir. 1971). It is well established that the mere *delivery* of materials to a construction site (including on-site mixing and pouring) is not building and construction industry work. *Overstreet v.Tucson Ready Mix, Inc.*, 11 F.Supp.2d 1139 (D. Ariz. 1998); *St. John Trucking, Inc.*, 303 NLRB 723, 139 LRRM 1020 (1991); *Lone Star Industries*, 291 NLRB 581, 131 LRRM 1274 (1988); *Bechtel Civil and Minerals, Inc.*, 87 Labor Arb. 153 (1986); *Teamster's Local 42 (Inland Concrete Enterprises, Inc.)*, 225 NLRB 209, 93 LRRM 1383 (1976); *Landstrom v. Teamsters Local Union No. 65*, 476 F.2d 1189 (2nd Cir. 1973); *Teamster's Local 294*, 195 NLRB 378, 79 LRRM 1452 (1972); *NLRB v. Teamster's Local 294*, 342 F.2d 18 (2nd Cir. 1965).

Furthermore, the NLRB's General Counsel's Office stated in *In re Todesca Corp.*, that "work at a construction jobsite by the unit employees involved is a necessary element for a finding of § 8(f) applicability." 1996 WL 138068 at *4 (N.L.R.B.G.C.) (Feb. 2, 1996) (attached hereto as **Exhibit B**). The NLRB General Counsel's office further opined that drivers who delivered asphalt to construction sites were *not* engaged in "construction industry" work for purposes of § 8(f) of the National Labor Relations Act, even though the drivers were occasionally called upon "to move a pile of material of some sort from one location on the jobsite to another...." *Id.* at *1.

Murphy argues that *Todesca* is distinguishable because "unlike the drivers in the *In Re Todesca* opinion, who only delivered materials for their employer, which only supplied those materials to third parties for use in construction projects, Teamsters at [Murphy]

worked only for [Murphy] in constructing pipe lines." (Def. Resp. at 10.) However, delivery of materials, whether to ones own employer or to a third party, is not considered building and construction industry work for purposes of the exemption. The relevant inquiry is whether Murphy's Teamsters were performing on-site construction work.

As Mr. Murphy's testimony shows, the Teamsters spent the majority of their time driving to and from the jobsite and the yard, the dump, the local water source, and sometimes, even local parts supply houses. (Pl. SAMF, ¶¶ 5-8.) Many of Murphy's Teamster employees, would spend their day driving people and equipment from the yard or warehouse out to the jobsite. (Pl. SAMF, ¶¶ 8, 9.). The yard was sometimes 5 or 10 miles from the jobsite, and several times, the yard was as far as 75 miles from the jobsite. (Pl. SAMF, ¶ 10.) This type of work, transporting materials to and from the job site, does not constitute work in the building and construction industry for purposes of the exemption under 29 U.S.C. §1383(b). *See Union Asphalts,* 857 F.2d at 1235. Similarly, in *Cent. States, Se. & Sw. Areas Pension Fund v. Waterland Trucking Service, Inc.*, *2006 WL 4094350* (N.D. Ill 2006) (attached hereto as **Exhibit C**) the court performed an analysis as to whether or not the mere delivery of materials to the jobsite constituted a sufficient connection to the construction site to be considered work in the building and construction industry. 2006 WL 4094350 at *4. The court found that the employees who merely delivered materials to and from the job site were not considered performing work in the building and construction industry. *Id.*

Murphy states in its Response that the Fund has attempted to "create the wrongful impression Teamsters are merely delivery people." (Def. Resp. at 12) That impression, however, is created by the facts. Mr. Murphy testified, "These are all the little blocks

underneath the pipe that keeps it up off the ground. Those were all delivered by our skid trucks which are manned by the teamsters." (Docket 25 at 85.) He also stated, "We'd have water trucks. They're driven by teamsters...we'd get a meter on hydrants and they'd just pull up the hydrant and fill them up...and deliver it to the job site." (Docket 25 at 77.) Mr. Murphy also testified that, "Basically any time we used any vehicle to transport people out to the job, it was driven by teamsters." (Docket 25 at 74.) The Murphy teamsters were delivery people, delivering both equipment and other workers, to the job site.

Murphy makes a vague argument that the Fund is attempting to "define the 'jobsite' by exclusion...to include only the trench where the pipe is buried." (Def. Resp. at 14.) In fact, Murphy is attempting to define the job site by inclusion. Murphy, it seems, would have the court believe that the job site includes an area that is sometimes 75 miles or more and thus would include whole towns, the local water supply, the dump, and all local parts supply houses. Regardless, it is clear from Mr. Murphy's own testimony that the yard and the job site are separate and distinct locations. For instance, in reference to how the actual pipe gets to the jobsite, Mr. Murphy testified. "We would load the pipe at the pipe yard...They would load it on the trailer. The trailer would drive out to the job site." (Docket No. 25 at 78.) In reference to various environmental materials, Mr. Murphy stated, "We would order fence, silt fence, hay bales...And then once it got in the yard...our teamster driven trucks, would go out to the job site." (Docket 25 at 91.) The testimony is clear, the job site and the yard are two different locations and Murphy's Teamster employees spent their time driving between the two locations. (Pl. SAMF, ¶¶ 5-8.)

Murphy's Teamster employees who did spend time on site, spent that time transporting materials within the construction site. (Pl. SAMF, ¶ 11.) However, this is also not the type of work which constitutes work in the building and construction industry. *Id.* In Mr. Murphy's own words, "the teamsters only job out there is to drive the vehicles." (Pl. SAMF, ¶ 4.) It was the job of the Laborers and the Operators to do actual onsite construction work. (Pl. SAMF, ¶¶ 13,14.) It was the Laborers and the Operators who were building and installing construction materials on site. (Pl. SAMF, ¶¶ 13,14.)

This Court must only determine whether the Fund's claim is colorable and the Fund need only prove that its arguments are not frivolous. *Bomar*, 253 F.3d at 1019. In this case, the testimony of Murphy's own president provides all the support needed to show that the employer is not entitled to the building and construction industry exemption and that the Fund's claim is not only colorable, but valid.

**B.    Murphy Will Not Be Irreparably Harmed By Making The Interim Payment.**

Even if Murphy were able to satisfy the court that the Fund's claim is frivolous, which it has not done, it must then establish that it would be irreparably harmed by making the interim payment. *Rentar Indus., Inc.*, 951 F.2d at 155 ("irreparable harm becomes important only if the employer makes an affirmative showing that the pension fund lacks a colorable claim.")

Murphy has failed to prove that it would suffer irreparable harm from a judgment against the company for its statutorily mandated interim withdrawal liability payments. Proving irreparable harm requires a showing of the threat of imminent insolvency. Debreceni v. Merchants Terminal Corp., 889 F.2d 1, 7 n.6 (1st Cir 1989); Warner & Sons, 2008 WL 4201014, *2. Murphy does not provide a single shred of evidence to indicate in

exactly what way it would be harmed. Murphy simply makes bold statements such as, "The Plaintiffs are using litigation as a bully pulpit" without ever attempting to satisfy its burden to prove irreparable harm. (Def. Resp. at 15.) Merely stating that the company would be irreparably harmed is insufficient to prove that Murphy is entitled to an exception from the interim payment obligation.

Murphy does take offence to the Fund's assertion that Murphy has enough money to pay its attorney's to defend this action and further increase the Fund's costs. Murphy states that there is no evidence that Murphy's attorneys have been paid, but never provides any evidence that they have not been paid either.

The Fund cannot be considered a bully for rightly seeking a statutorily mandated payment. If Murphy truly has no assets with which to pay, then there is no harm in requiring the payment. The truth of the matter remains that a finding of summary judgment in favor the Fund does not guarantee that Murphy is collectible. However, whether Murphy is collectible is not relevant to the inquiry as to whether it is required to make interim payments. Murphy has failed to show how requiring the company to make its statutorily mandated interim payment would cause irreparable harm and thus Murphy's motion for summary judgment should be denied.

## III.  CONCLUSION

In conclusion, Murphy has failed to establish that the Pension Fund both lacks a colorable claim and that Murphy would be irreparably harmed by making the interim payment. For these reasons, Plaintiffs request that this Court grant the Fund's motion for summary judgment and deny Murphy's motion for summary judgment.

Respectfully submitted,

 s/ Timothy C. Reuter
Timothy C. Reuter  (ARDC #06279373)
CENTRAL STATES FUNDS
9377 W. Higgins Road, 10th Floor
Rosemont, IL  60018
(847) 518-9800, Ext. 3481
treuter@centralstatesfunds.org

December 13, 2010                    *COUNSEL FOR CENTRAL STATES*

**CERTIFICATE OF SERVICE**

      I, Timothy C. Reuter, one of the attorneys for the Central States, Southeast and Southwest Areas Pension Fund, certify that on December 13, 2010, I electronically filed the forgoing Plaintiffs' Reply Memorandum in Support of its Motion for Summary Judgment with the Clerk of the Court using the ECF system. This filing was served on all parties indicated on the electronic filing receipt via the ECF system.

      s/ Timothy C. Reuter
Timothy C. Reuter (ARDC #06279373)
CENTRAL STATES FUNDS
Law Department
9377 W. Higgins Road, 10th Floor
Rosemont, IL  60018
(847) 518-9800, Ext. 3481
treuter@centralstatesfunds.org

*COUNSEL FOR CENTRAL STATES*